UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

POTESTIVO, VERONICA,

    Plaintiff,                              Civil Action No. 09-10687

v.                                      HON. DENISE PAGE HOOD
                                          U.S. District Judge
                                          HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL             U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Veronica Potestivo brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED, remanding the case to the administrative level pursuant to sentence four of § 405(g), for further proceedings consistent with this Recommendation.

## PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on March 16, and March 27, 2006 respectively, alleging disability as of November 3, 2004 (Tr. 104-107, 108-110). After the initial denial of the claim, Plaintiff made a timely request for an administrative hearing, held on August 8, 2008 in Fort Gratiot, Michigan (Tr. 27). Administrative Law Judge ("ALJ") James Gildea presided via teleconference from Chicago, Illinois (Tr. 29). Plaintiff, represented by Donald Shiffman, testified, as did Vocational Expert Thomas Dunleavy (Tr. 31-64, 65-70). On September 30, 2008, ALJ Gildea found that Plaintiff could perform her former work as well as a significant range of other jobs (Tr. 24, 26). On February 9, 2009, the Appeals Council denied review (Tr. 1-3). Plaintiff filed suit in this Court on February 24, 2009.

## BACKGROUND FACTS

Plaintiff, born December 9, 1955 was age 52 and nine months at the time of the administrative decision (Tr. 104). She completed high school and worked previously as an assembly worker, home health care aide, and short order cook (Tr. 135, 139). Her application alleges disability as a result of arthritis, thyroid problems, and psychological conditions (Tr. 134).

### A.     Plaintiff's Testimony

Plaintiff, 5', testified that she currently weighed 208 pounds (Tr. 31). She reported that she lived in a single family home with her husband (Tr. 32). She stated that she held a driver's license, but drove a little as possible (Tr. 32). Plaintiff, a high school graduate, testified that she last worked on November 19, 2002 as a health care aide, adding that she

-2-

worked only part time (Tr. 33). She reported that prior to holding the health aide position, she worked for 15 years as a small parts assembler (Tr. 34-35).

Plaintiff testified that she currently took medication for rheumatoid arthritis, heart problems, acid reflux, and thyroid replacement as well as Albuterol inhalers for an asthma condition and biweekly shots for allergies (Tr. 35, 37). She added that her respiratory problems were exacerbated by secondhand smoke (Tr. 36). Plaintiff denied medication side effects (Tr. 37). She noted that her thyroid levels were monitored every three months, indicating that if she failed to take her thyroid medicine, she became dizzy (Tr. 38). She reported that at the time of the referral to a specialist, she was unable to hold a cup, put on socks, or comb her hair (Tr. 39). She acknowledged that arthritis medication helped her cope with the condition (Tr. 40). Plaintiff added that since being diagnosed with an enlarged heart, she had changed her eating habits (Tr. 41). She reported that she typically arose at 7:00 a.m. and retired at 9:00 p.m. (Tr. 42-43).

Plaintiff indicated that she divided her waking hours between taking care of her disabled husband's needs (four hours), taking care of her own personal needs, and sitting in a recliner (Tr. 43-44). She reported that she relied on church members to take her husband to doctors' appointments (Tr. 44). Plaintiff testified that laundry and cooking chores took a total of approximately three hours per day (Tr. 45). Plaintiff estimated that she ran errands semiweekly (Tr. 46). She indicated that her nephew performed all of the yard work (Tr. 47). Plaintiff alleged that her health problems had forced her to give up her former pastimes of playing pool, bowling, and going to the movies (Tr. 48).

In response to questioning by her attorney, Plaintiff testified that her least physically demanding "assembly" job involved cutting excessive plastic off an assembly part, noting that the job was performed in a sitting position and did not require her to lift more than 10 pounds (Tr. 48-49). Plaintiff, indicating that she had sought hospital treatment for joint pain, testified that she had been recently referred to a specialist for knee, left shoulder, and left hip pain (Tr. 52-53). She attributed her current joint problems in part to a "late 1970's" left femur fracture that prevented her from working for two years (Tr. 54). Plaintiff alleged that in approximately 1995, she received a diagnosis of Carpal Tunnel Syndrome ("CTS"), noting that she experienced occasional hand numbness (Tr. 55-56). Plaintiff reported that wrist and hand problems prevented her from sewing by hand (Tr. 56). She alleged that sitting in one position for more than 30 minutes created left hip pain (Tr. 56-57). As a result of knee problems, Plaintiff testified that she was unable to stand for more than five minutes, walk for more than 50 feet, or lift more than five pounds (Tr. 57-58).

In addition to her physical conditions, Plaintiff alleged anger management and memory problems, also reporting that she currently took Cymbalta for depression (Tr. 59-60). She noted that because of various health problems, she performed household and self care tasks at a slow pace, reiterating that she spent at least half of her waking hours each day in a recliner (Tr. 61-62). Her attorney identified her current rheumatoid arthritis drug as Methotrexate (Tr. 62). In response to additional questioning by the ALJ, Plaintiff indicated that her condition had notably worsened within the past year (Tr. 62-63). She reported that hand swelling had more recently required her to give up sewing either by hand or with a

machine (Tr. 63).

### B. Medical Evidence

### 1. Treating Sources

In February, 2005, physician's assistant Kimberly Verellen noted the presence of a raised cholesterol count, hypothyroidism, and GERD (Tr. 177). April, 2005 thyroid testing showed improved "but not 100%" results (Tr. 192). In February, 2006, Plaintiff completed a mental health intake assessment, noting at that time that arthritis in both knees was "not bad" (Tr. 236). She indicated that she attended church services each week and participated in a women's group (Tr. 232). In March, 2006, an upper endoscopy showed a large hiatal hernia and a colonoscopy revealed a small benign polyp (Tr. 205-206). Plaintiff was diagnosed with "mild chronic gastritis" (Tr. 204). The same month, Mutee H. Abdeljaber, M.D. noted diagnoses of allergic rhinitis and asthma (Tr. 221).

Also in March, 2006, mental health counseling notes by Nathan Bushey, indicate that Plaintiff complained of financial and interpersonal frustrations creating sleep disturbances and feelings of anger (Tr. 254, 266-269). She was assigned a GAF of 52[1] (Tr. 254, 447). Treating notes from the following month show that Plaintiff continued to receive weekly allergy shots (Tr. 217-218). Plaintiff was encouraged by Bushey to schedule time for herself apart from her care giving chores for her husband (Tr. 264). The same month, Plaintiff

---

[1] A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*) (4th ed.2000).

reported that her relationship with her husband had improved (Tr. 261). In June, 2006, Plaintiff was prescribed Cymbalta (Tr. 504). Later the same month, Plaintiff reported that Cymbalta was "working well" (Tr. 503). However, in July and August, 2006, Plaintiff reported stress as a result of her husband's deteriorating health (Tr. 413, 491). In August, 2006, imaging studies of the lumbar spine were unremarkable (Tr. 371). In October, 2006, an echocardiogram showed no abnormalities (Tr. 366). Dr. Ogboh's treating notes from August, 2007 show that Plaintiff took Cymbalta for depression (Tr. 355). In October, 2007, imaging studies of the left hip and knee showed degenerative changes (Tr. 347, 350).

In December, 2007, orthopedic surgeon Lawrence D. Holen, D.O. assessed Plaintiff's complaint of knee pain (Tr. 304-306). He advised Plaintiff to lose weight (Tr. 306). The same month, an MRI of the left knee showed moderate degenerative changes, but "no evidence of internal derangement" or dislocation (Tr. 302). Based on the MRI, Dr. Holen diagnosed Plaintiff with mild arthritis with degenerative changes at the left hip (Tr. 301). However, a whole body bone scan showed osteoarthritic changes in the knees and left ankle (Tr. 300). The following month, Dr. Holen diagnosed Plaintiff with rheumatoid arthritis with a SED rate of 70, recommending that treatment with anti-inflammatories and antimetabolites (Tr. 293).

The same month, treating notes by Michael Ogboh, D.O. indicate that Plaintiff currently took Cymbalta and had been referred to a rheumatologist (Tr. 339). Barbara McIntosh, M.D. prescribed Plaquenil and Diclofenac (Tr. 311). In February, 2008, Plaintiff again received a GAF of 52 from her counselor (Tr. 385, 402). In April, 2008, Plaintiff

reported "no improvement" from Plaquenil (Tr. 310). The same month, Kathy Spiegel, LBSW, found that due to depression, Plaintiff's self-direction and activities of daily living were markedly reduced (Tr. 403).

The following month, Plaintiff was prescribed Methotrexate (Tr. 307). In June, 2008, imaging studies showed mild degenerative disease but the absence of spondylolysis (Tr. 331). The following month, Kathy Spiegel, BA, LBSW, summarized Plaintiff's psychological condition based on the past two years of counseling, noting that she continued to experience depression, isolation, and sleep disturbances (Tr. 511-512). Consistent with prior evaluations, she assigned Plaintiff a GAF of 52 (Tr. 511). Plaintiff was deemed "unable to meet competitive standards" in maintaining attention, adhering to attendance policies, sustaining an ordinary routine, making decisions, working without psychologically based interruptions, working at a consistent pace, and dealing with stress (Tr. 513). Spiegel also found that Plaintiff's psychological impairments were exacerbated by mobility issues as a result of rheumatoid arthritis (Tr. 514).

### 2. Non-Treating Sources

In June, 2006, Tama D. Abel, M.D. performed a consultive physical examination of Plaintiff on behalf of the SSA (Tr. 270-273). Plaintiff reported hip and knee pain since 2000, noting that she had been taking thyroid replacement medication since the 1999 removal of her right thyroid gland (Tr. 270). She reported that Nexium and dietary changes relieved symptoms of acid reflux (Tr. 270). Plaintiff admitted that she continued to drive and did not use an assistive device (Tr. 271). Dr. Abel reported that Plaintiff denied difficulty with fine

manipulations or taking pain medication (Tr. 271, 273). He found normal ranges of motion (Tr. 271-272). Dr. Abel opined that Plaintiff's "obesity is probably the most significant impediment in her ability to perform certain activities" (Tr. 272).

The following month, psychologist Christian R. Barrett conducted a psychiatric/psychological examination of Plaintiff, noting that she reported anger management problems, but reported good results from Cymbalta and counseling (Tr. 274). Plaintiff also alleged constant knee and hip pain, reporting that she was unable to sit for more than 15 minutes, stand for more than two, and walk for half a block (Tr. 274). Dr. Barrett observed a normal (but "somewhat flat") affect and symptoms of mild depression, assigning Plaintiff a GAF of 60 to 65[2] (Tr. 276-277). The same month, a Psychiatric Review Technique completed by James Tripp, Ed.D found the presence of a non-severe affective disorder (depression)[3] (Tr. 279, 282). He determined that Plaintiff experienced mild limitations of concentration, persistence, or pace, but was otherwise unimpaired (Tr. 289).

### C. Vocational Expert Testimony

VE Dunleavy classified Plaintiff's former job as a "trimmer" as exertionally sedentary

---

[2]GAF scores in the range of 61-70 indicate "some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 32 (*DSM-IV-TR* ), 30 (4th ed.2000).

[3]Obviously, the consultive psychological evaluation and Psychiatric Review Technique was performed without benefit of any of Plaintiff's post-July, 2006 mental health treating records.

-8-

and "gluer," and assembler as light[4] (Tr. 64-65). He noted that all three positions were unskilled (Tr. 65). In response to questioning by the ALJ, Plaintiff noted that she attended special education classes until graduating from high school (Tr. 66). Assuming Plaintiff's age, education, and work background, the ALJ listed the following hypothetical limitations:

> "Has the residual functional capacity to perform at the light exertional level which does not require climbing ladders, ropes or scaffolds or more than occasional climbing of ramps and stairs or more than occasional balancing, stooping, kneeling, crouching or crawling. Does not require more than frequent reaching, handling or fingering. Could such an individual perform the past relevant work either as the Claimant performed it or as generally performed in the national economy?"

(Tr. 66). The VE found that the hypothetical individual could perform Plaintiff's former work as a small products assembler (Tr. 67). The VE testified that the additional limitations of "simple, un-skilled" work would not change his findings (Tr. 67). However, if the individual were additionally limited by inability to stand for more than two hours, all of Plaintiff's former work would be precluded (Tr. 67). Next, the VE testified that if the original limitations were amended to include "simple, un-skilled" work but omitted the "two-hour standing" limitation, the individual could perform the work of a cafeteria attendant (7,000 jobs in the State of Michigan), office cleaner (12,000), and a packager/inspector

---

[4] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

(2,000) (Tr. 68).

The VE found that if the same individual were unable to concentrate for 85 percent of the work period or was required to miss two or more days of work each month, all competitive employment would be precluded (Tr. 68). The VE added that if the individual was limited to only occasional reaching and lifting in the upper extremities, that limitation (combined with the original limitations and the "simple, un-skilled work" limitations) would also preclude all work (Tr. 69). The VE stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 69). In response to questioning by Plaintiff's attorney, the VE acknowledged that the "trimmer" position's "frequent" handling requirement would place it in the "light" rather than "sedentary" exertional category (Tr. 70).

### D.     The ALJ's Decision

ALJ Gildea found that although Plaintiff experienced the severe impairments of arthritis, obesity, and an adjustment disorder (as well as the *non-severe* impairments of cardiomegaly, thyroid disorder, acid reflux, asthma, and "a reported history of [CTS]"), none of the conditions met or equaled an impairment listed in Appendix 1 Subpart P, Regulation No. 4. (Tr. 14-15). The ALJ found that Plaintiff retained the following Residual Functional Capacity ("RFC"):

> "[T]o perform light work . . . lifting, carrying, pushing or pulling up to 20 pounds occasionally and up to 10 pounds frequently; standing and walking up to six hours a day with normal breaks and sitting for a like number. She is limited to performing no work requiring climbing ladders, ropes or scaffolds, no work requiring more than occasional climbing of ramps and stairs, no work

>   requiring no more than occasional balancing, stooping, kneeling, crouching or crawling, and no more than frequent handling or fingering"

(Tr. 16-17). Adopting the VE's testimony, the ALJ found that Plaintiff could perform her past relevant work as a small products assembler, as well as jobs as a cafeteria attendant, office cleaner, packager, inspector, and weigher (Tr. 24-25).

The ALJ found Plaintiff's allegations of disability were "not credible to the extent they [were] inconsistent with the residual functional capacity assessment" (Tr. 22). He noted that Plaintiff continued to care for her disabled husband, cooked, cleaned, and read mystery novels (Tr. 23). He noted further that none of her treating physicians found that she was incapable of gainful employment (Tr. 23).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.

1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

Plaintiff argues first that the ALJ's finding that she could perform exertionally light work stands unsupported by the record, arguing that as such, the ALJ ought to have found her disabled as of her fiftieth birthday.[5] *Plaintiff's Brief* at 6-8, *Docket #10*. On a related note, she contends that the credibility determination was invalidated by the ALJ's erroneous use of record evidence. *Id.* at 10. Because of errors in the ALJ's analysis of Plaintiff's psychological and physical impairments, a remand is required.

### A. An Affective Disorder

Plaintiff submits that the RFC found in the administrative opinion (identical to the hypothetical limitations posed to the VE) did not account for her full degree of limitation. Specifically, she contends that the ALJ's selective reading of her counseling records amounts to a distortion of the record.

The RFC describes an individual's residual abilities. *Howard v. Commissioner of Social Security,* 276 F.3d 235, 239 (6th Cir. 2002). "RFC is to be an 'assessment of [Plaintiff's] remaining capacity for work' once her limitations have been taken into account." *Id.* (*quoting* 20 C.F.R. § 416.945). In determining a person's RFC, it is necessary to consider

---

[5]

In the present case, whether Plaintiff, almost 53 at the time of the decision, could perform light work is critical since a finding that she was unable to perform any past relevant (light) work, coupled with a finding that she could perform only sedentary work, would direct a finding of disabled. "The 'grid,' Pt. 404, Subpt. P, App. 2, directs a finding of disabled if Plaintiff [closely approaching advanced age] has a residual functional capacity [] for only sedentary work, § 201.09, but not if [the] RFC is light. § 202.10." *Davis v. Secretary of Health and Human Services* 634 F.Supp. 174, 177 (E.D.Mich.,1986); 20 C.F.R. Pt. 404, Subpt. P., App. 2, Rule 201.09 (1999); *see also Scales v. Commissioner of Social Sec.*, 1996 WL 343533, *2 (6th Cir. 1996).

(1) objective medical evidence as well as (2) subjective evidence of pain or disability. *See* 20 C.F.R. § 404.1545(a) (RFC must be based on all relevant evidence).

Likewise, an ALJ's choice of hypothetical limitations must include the claimant's relevant limitations. "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments"(internal citations omitted). *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987); *Webb v. Commissioner of Social Sec.* 368 F.3d 629, 632 (6th Cir. 2004).

In making his Step Four finding that Plaintiff could return to her former work, the was ALJ was permitted but not required to use the VE. *Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987); *See also Mays v. Barnhart,* 78 Fed. Appx. 808, 813-814 (3rd Cir. 2003)("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ"). A hypothetical question's deficiencies, with nothing more, would not invalidate a Step Four finding that a claimant could perform her former work. However here, because the ALJ explicitly stated that the Step Four conclusion was based on the VE's testimony (Tr. 24), material deficiencies in the hypothetical question would constitute reversible error consistent with a Step Five determination. Hence, the administrative opinion (also containing a Step Five finding that Plaintiff could perform other work) must be based a hypothetical question supported by substantial evidence. *See Varley, supra*; *see also Teverbaugh v. Comm'r of Soc. Sec.,* 258

F. Supp. 2d 702, 706 ( E.D. Mich. 2003)(Roberts, J.)("Because the VE's testimony was the only step five evidence that the ALJ relied upon, the Court cannot rule that there is substantial evidence to support the ALJ's findings").

First, the ALJ's failure to account for Plaintiff's psychological impairments in crafting the hypothetical question and RFC taints the VE's testimony that Plaintiff could perform her past relevant work. Despite the fact that the ALJ found that Plaintiff's adjustment disorder (depression) was a severe impairment at Step Two of his analysis, both the hypothetical question and RFC omit any reference to Plaintiff's well established psychological limitations. Although the ALJ himself acknowledged a moderate level of social impairment at Steps Two and Three (Tr. 14, 16), the hypothetical question and RFC were bereft of corresponding limitations, *i.e.,* a limitation on contact with coworkers or the public. While "a hypothetical question need not incorporate a listing of the claimant's medical conditions, the vocational expert's testimony, to be reliable, must take into account the claimant's functional limitations, *e.g.*, what he or she 'can and cannot do.'" *Infantado v. Astrue,* 263 Fed.Appx. 469, 476 (6th Cir. 2008)(*citing Webb v. Comm'r of Social Sec*., 368 F.3d 629, 632-33 (6th Cir.2004)). The psychological limitations found at both Step Two and Three of the analysis must be acknowledged in the hypothetical question. The failure to do so constitutes reversible error. *See Tinker v. Astrue* 2009 WL 3064780, *9 (E.D.Mich 2009)(Edmunds, J.).

Moreover, the failure to address Plaintiff's psychological limitations at Step Four are compounded by substantive errors tainting the credibility determination as well as the hypothetical question and RFC. The ALJ, acknowledging that Plaintiff sought mental health

treatment in February, 2006, cites July 5, 2006 *medical* treating notes for the proposition that her psychological problems had resolved (Tr. 19 *citing* 373). However, treating notes by Plaintiff's *mental* health provider created only two days later state that she was "upset, frustrated [and] depressed" (Tr. 499). While mental treating notes for the two years in question contain scattered references to Plaintiff's "bright and alert" affect (Tr. 414, 417, 421, 424, 456, 462-463, 494, 487), treating records from July, 2006 forward more often describe her as "constricted" (Tr. 460, 465, 498), "frustrated" (Tr. 496), "very upset" (Tr. 493), "angry, frustrated [and] tearful" (Tr. 492), having "difficulties with emotions" (Tr. 491), "tired and worn" (Tr. 489), "still stressed" (Tr. 486), "frustrated, sad" (Tr. 483), "tired, pale and worn" (Tr. 481), "tired and frustrated" (Tr. 459), "tired, worn and frustrated (Tr. 457), "overwhelm[ed]" (Tr. 431), "worn and frustrated" (Tr. 430) and "angry and frustrated" (Tr. 413). In support of the non-disability finding, the ALJ also observed that Plaintiff's nephew and his children had begun living with her in August, 2007 (Tr. 22 *citing* 414), but either overlooked or ignored treating notes created 13 days later stating that the presence of her nephew (a recent parolee) exacerbated, rather than relieved her stress (Tr. 413).

The Court is mindful that the ALJ need not support his findings with a preponderance of the evidence. By the same token, "cherry picking" favorable statements from a record that as a whole, demonstrates the need for long-term mental health intervention amounts to a distortion of the record. "'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record" *Laskowski v. Apfel,* 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000)(Roberts, J.)(*citing Cotter v. Harris*, 642 F.2d 700, 706

(3rd Cir. 1981). Likewise, "[s]ubstantial evidence cannot be based on fragments of the record." *Laskowski,* at 482.

### B. Physical Impairments

Likewise, the ALJ's account of Plaintiff's physical abilities ignores or misconstrues key evidence in favor of the disability claim. The ALJ acknowledged in passing Plaintiff's December, 2007 diagnosis of arthritis[6] (Tr. 21). However, Plaintiff's "sed" rate test yielding a "70" (over twice the maximum "normal" range score of 29) lends credence to her testimony that knee, hand, wrist, and shoulder pain required her to recline when not attending to her disabled husband's needs [7] (Tr. 39, 56-57, 61-62, 293).

In fact, while the ALJ used Plaintiff's long-term and devoted care of her physically and mentally incapacitated husband to show that she was not deserving of benefits, the record suggests that Plaintiff (faced with the sole responsibility of attending to her husband's needs)

---

[6] Citing *Higgs v. Bowen,* 880 F.2d 860 (6th Cir. 1988), Defendant contends that Plaintiff "cannot be awarded DIB based on her rheumatoid arthritis" because "[t]he record clearly shows" that the condition did not begin until after her date last insured of December 31, 2007. *Defendant's Brief* at 9, *Docket #16.* Plaintiff's sed rate of 70 was not referenced in her treating records until January, 2008. However, treating records created in December, 2007 before the expiration of benefits show that Plaintiff already experienced and reported limitations associated with RA well before December 31, 2007. Moreover, as discussed above, the ALJ acknowledged that arthritis, (if not rheumatoid arthritis) was diagnosed in December, 2007 (Tr. 21).

[7] A sed rate or erythrocyte sedimentation rate ("ESR") is a blood test used in the diagnosis of rheumatoid arthritis. http://www.mayoclinic.com/health/sed-rate.

cared for him *in spite* of her own psychological and physical limitations. To be sure, the ALJ was not required to accept her testimony that she was unable to stand for more than five minutes, walk for more than 50 feet, or lift more than five pounds without further inquiry (Tr. 57-58). On the other hand, his finding that Plaintiff could walk and/or stand for up to six hours in a workday (mainly based on her admitted daily activities on behalf of her husband) ignores overriding and objective evidence showing that her work capacities were significantly curtailed by rheumatoid arthritis and psychological impairments.

Because the possibility remains that Plaintiff is capable of some, albeit less strenuous work, I recommend that this case be remanded for reconsideration of the Residual Functional Capacity consistent with the above analysis. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994). In making this recommendation, I note that (1) the medical record contains evidence that Plaintiff experienced rheumatoid arthritis prior to the December 31, 2007 expiration of benefits, and (2) a Step Five determination that Plaintiff is capable of only sedentary work would render her disabled as of her 50th birthday pursuant to 20 C.F.R. Pt. 404, Subpt. P., App. 2, Rule 201.09 (1999).

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding the case to the administrative level pursuant to sentence four of § 405(g), for further proceedings consistent with this Recommendation.

Any objections to this Report and Recommendation must be filed within fourteen

(14) days of service of a copy hereof, including weekends and intervening holidays, as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, including weekends and intervening holidays, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                                      s/R. Steven Whalen
                                                      R. STEVEN WHALEN
                                                      UNITED STATES MAGISTRATE JUDGE

Dated:  January 7, 2010

CERTIFICATE OF SERVICE

-20-

<u>The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 7, 2010.</u>

                                              <u>s/Susan Jefferson</u>
                                              Case Manager

2:09-cv-10687-DPH-RSW Doc # 19 Filed 01/07/10 Pg 20 of 20 Pg ID 622